**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Don't Waste Arizona Incorporated,<br><br>             Plaintiff,<br><br>v.<br><br>Hickman's Egg Ranch Incorporated,<br><br>             Defendant. | No. CV-16-03319-PHX-GMS<br><br>**ORDER** |

Pending before the Court are Plaintiff's Motion for Clarification, (Doc. 115), the parties' briefs concerning the retroactive application of the FARM Act, (Docs. 119, 120), and the supplemental briefing concerning the reporting of emissions from animal waste under EPCRA, (Docs. 126, 127).

## BACKGROUND

Defendant Hickman's Egg Ranch Inc. operates two large chicken egg facilities, each emitting more than one thousand pounds of ammonia from chicken manure per day. (Doc. 61, Exh. 4). Plaintiff Don't Waste Arizona Inc. ("DWA") is an environmental non-profit with members who live in the vicinity of Hickman's facilities. (Doc. 1). DWA brought this suit against Hickman's based on its failure to report ammonia emissions in violation of the Emergency Planning and Community Right-to-Know Act. *Id.* In preparation for a bench trial, the parties asked the Court to clarify various legal questions. First, the Court addresses whether EPCRA requires reports of emissions from animal waste. Second, the Court addresses relevant burdens of proof.

**DISCUSSION**

I.      **Defendant's Reporting Requirement Under EPCRA**

        A.      **EPCRA Background**

        The Emergency Planning and Community Right-to-Know Act ("EPCRA") maintains "a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and provide for emergency response in the event of health-threatening release[s]." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 86 (1998); 42 U.S.C. §§ 11001–11050. EPCRA requires facilities which produce, use, or store a hazardous chemical to report any large-scale release of certain hazardous chemicals to the state emergency response commission ("SERC") and the local emergency planning commission ("LEPC"). 42 U.S.C. § 11004. Any person may commence a lawsuit against an owner or operator for failure to submit a follow-up emergency notice. 42 U.S.C. § 11046(a)(1)(A)(i).

        EPCRA requires facilities to report the release of a hazardous chemical under three circumstances, listed in three separate subsections. 42 U.S.C. § 11004(a).[1] Under the first and third subsections, a facility must report a release if "such release requires a notification under section 103(a) of the Comprehensive Environmental Response, Compensation and Liability Act."[2] 42 U.S.C. § 11004(a)(1); *see also* 42 U.S.C. § 11004(a)(3). Under the second subsection, a facility may still be required to report a release of an EPCRA hazardous chemical (even if notification under CERCLA is not required) if the release is (A) not a federally permitted release, (B) exceeds a certain amount determined by regulation, and (C) "occurs in a manner which would require

---

        [1] This section of the United States Code is based on section 304 of the public law enacting EPCRA, and many other publications refer to it as "EPCRA section 304."

        [2] Six years prior to implementing EPCRA, Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), which provides for the liability, compensation, cleanup, and emergency response when hazardous substances are released into the environment. *Chubb Customs Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (citations omitted). Although CERCLA and EPCRA have different purposes, both concern the release of toxic and hazardous chemicals, and Congress explicitly based many EPCRA provisions on CERCLA.

notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(2). Notwithstanding any of the three scenarios that might trigger the EPCRA reporting requirement, the EPCRA statutory definition of "hazardous chemical" explicitly exempts "[a]ny substance to the extent it is used in routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer." 42 U.S.C. § 11021(e)(5).

In 2008, the EPA updated federal regulations concerning the reporting obligation in CERCLA section 103(a). The 2008 rule generally exempted farms from reporting releases of hazardous chemicals from animal waste under CERCLA, but the regulation carved out large, concentrated animal feeding operations, known as "CAFOs," and required them to report threshold releases of hazardous chemicals. 73 Fed. Reg. 76948, 76950–53 (Dec. 18, 2008).[3] However, the 2008 Rule pertained only to the CERCLA section 103(a) reporting requirements (and the associated EPCRA reporting requirements based on CERCLA section 103(a)). The EPA explicitly did not define "routine agricultural operations" in the 2008 rule. 73 Fed. Reg. 76948, 76951. The final rule did not reference the EPCRA definition of hazardous chemical in 42 U.S.C. § 11021(e), and it explicitly stated that the rule was not based on the EPCRA exception for routine agricultural operations, explaining, "The Agency is not, in this rule, defining . . . routine agricultural operations." *Id.*

///

---

[3] Public comment supported the EPA's decision to treat CAFOs differently than other farms.

> [T]he Agency did receive comments from the public, as well as from environmental groups, a coalition of family farmers and others expressing the desire for information regarding emissions of hazardous substances to the air from large animal feeding operations. Accordingly, the EPA decided to bifurcate the administrative reporting exemption for EPCRA section 304 so as to retain certain emergency notifications for large CAFOs. In addition, we sought comment on possible alternative definitions for farm, indicating EPA might take factors such as size into account. Although not specifically addressing the definition of a farm, we did receive many comments asserting that very large farms are no different than other industrial sources and should be regulated as such. We believe that our threshold approach addresses those concerns.

73 Fed. Reg. 76948, 76952 (Dec. 18, 2008).

In 2017, the District of Columbia Circuit considered the validity of the 2008 rule. *Waterkeeper Alliance v. Environmental Protection Agency*, 853 F.3d 527 (D.C. Cir. 2017). The D.C. Circuit vacated the 2008 final rule because it could not "be justified either as a reasonable interpretation of any statutory ambiguity or implementation of a *de minimis* exception." *Id.* at 537–38. The *vacatur* of the 2008 final rule thus eliminated the CERCLA section 103(a) reporting exemption for animal waste on farms, and it also eliminated the regulations concerning the CAFO carve out. *Id.* at 538.

In March 2018, Congress addressed the D.C. Circuit's *vacatur* of the 2008 Final Rule and passed legislation to reinsert the exemption relieving farms from reporting releases from animal waste under CERCLA section 103(a). Consolidated Appropriations Act of 2018 Title XI, Pub. L. 115-141, 132 Stat. 348 (2018). Known as the "Fair Agricultural Reporting Method Act" or "FARM Act," it states, "Section 103 of [CERCLA] is amended by . . . inserting the following: . . . In general.—This section shall not apply to—. . . (B) air emissions from animal waste (including decomposing animal waste) at a farm." The FARM Act further defines animal waste as feces, urine, or other excrement from any form of livestock, poultry, or fish, and it defines farm as a site or area that is used for crop production or the raising or selling of animals.

On August 1, 2018, the EPA published a new rule in response to the FARM Act and the D.C. Circuit's *vacatur* of the 2008 rule. 83 Fed. Reg. 37444 (Aug. 1, 2018). The new rule noted the removal of any provisions in the 2008 final rule. *Id.* at 37445. It then reinserted the CERCLA section 103 exemption for reporting air emissions from animal waste. *Id.* at 37445.

**B.    Validity of 2008 Final Rule**

The court finds persuasive and adopts  the D.C. Circuit's reasoning in *Waterkeeper Alliance v. Environmental Protection Agency*, 853 F.3d 527 (D.C. Cir. 2017) and acknowledges the invalidity of the 2008 Final Rule "[b]ecause the EPA's action . . . can't be justified either as a reasonable interpretation of any statutory ambiguity or implementation of a *de minimis* exception . . . ." *Waterkeeper Alliance v.*

*Environmental Protection Agency*, 853 F.3d 527 (D.C. Cir. 2017).  In the suit, the National Pork Producers Council "argue[d] that the *Final Rule's* CAFO carve-out can't stand because it was based on a factor . . . which  the Council argues is irrelevant to the statutory purpose . . . ." *Id.* at 532.  The D.C. Circuit explained that the *vacatur* of the rule "necessarily moots the Pork Producers' challenge to the CAFO carve-out" and it dismissed their petition. *Id.* at 538.  Although the FARM Act reinstated the portion of the vacated rule pertaining to the CERCLA section 103 exemption for reporting air emissions from animal waste, the FARM Act did not reinstate any parts of the 2008 final rule pertaining to CAFOs and their reporting obligation under EPCRA.  Therefore, regardless of the retroactivity of the FARM Act, the regulation requiring CAFOs to report threshold releases of hazardous emissions from animal waste is invalid and thus does not apply to the present case.

### C.    Retroactivity of the FARM Act

Defendant Hickman's argues that the amendment in the recent FARM Act should retroactively apply to this lawsuit.  (Doc. 120).  Whether a new law should retroactively apply to events that transpired prior to its passage requires analysis pursuant to *Landgraf v. USI Film Prods.*, 511 U.S 244 (1994).

The first step in the *Landgraf* analysis considers whether the statute contains an express statement on its retroactivity.  *Id.* at 280.  The FARM Act contains no language about its temporal scope.

The second step examines whether the amendment's application would have a retroactive effect on the facts in the present case.  *Id.* at 280.  A statute has retroactive effect if it would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*  "If the statute would operate retroactively, our traditional presumption teaches that it does not govern . . . ." *Id.* at 280.  The Ninth Circuit has previously held that an amendment that "extinguish[es] Defendants' liability, . . . thus depriving Plaintiffs of a pre-existing cause of action" would have retroactive effect.  *Beaver v. Tarsadia*

*Hotels*, 816 F.3d 1170, 1187–88 (9th Cir. 2016). If the FARM Act applied to the facts in this case, then Hickman's would not be required to report releases under EPCRA as codified in 42 U.S.C. § 11004(a). Hickman's would be exempt under subsection one and three because farms need not report emissions from animal waste under CERCLA section 103, and Hickman's would not be required to report under subsection two because CERCLA does not require reports for continuous releases (like those from animal waste), 42 U.S.C. § 9603(f), and thus the release would not "occur[] in a manner" which would require notification under CERCLA. 42 U.S.C. § 11004(a)(2). Therefore, the FARM Act would have retroactive effect because it would deprive DWA of a pre-existing cause of action.

When a statute is determined to have retroactive effect, the final step of the *Landgraf* analysis assesses whether "clear congressional intent" nonetheless favors retroactive application. *See Landgraf,* 511 U.S. at 280. Courts employ a presumption that Congress did not intend for legislation to operate retroactively. *Id.* Not only does the FARM Act lack an express statement of retroactivity, nothing in the legislation otherwise suggests an intent for it to apply retroactively. Therefore, the Court finds that the FARM Act does not retroactively apply to this case.

### D.     Exemption for "routine agricultural operations"

Since its inception in 1986, EPCRA has exempted "[a]ny substance to the extent it is used in routine agricultural operations" from its statutory definition of "hazardous chemical." 42 U.S.C. § 11021(e)(5). The parties present three instances where the EPA has referenced the meaning of "routine agricultural operations" since 1986: first, in the 1987 final rule; second, in the 2008 final rule; and third, in recent guidance documents.

### 1.     Chevron Deference for 1987 Rule

"When a court reviews an agency's construction of the statute which it administers," it first asks "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Second, if the intent of Congress is not clear and the statute is silent or

ambiguous with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Courts should give considerable weight to an agency's construction of a statutory scheme. *Id.* at 844.

In 1987, the EPA issued a final rule concerning EPCRA regulations and addressed the "routine agricultural operations" definition in the statute. The statutory language in EPCRA clearly exempts facilities from reporting releases from "routine agricultural operations," but the statute does not clearly identify which activities qualify as a routine agricultural operation. An overarching purpose of EPCRA is to support emergency planning efforts and to provide information concerning potential chemical hazards present in the community. *See* Pub.L. 99-499, Title III, Oct. 17, 1986, 100 Stat. 1736; 52 Fed. Reg. 38344 (Oct. 15, 1987). In the 1987 final rule, the EPA stated that it believed that the exemption was "designed to eliminate reporting of fertilizers, pesticides, and other chemical substances when applied, administered, or otherwise used as part of routine agricultural activities." 52 Fed. Reg. 38344, 38349 (Oct. 15, 1987). Additionally, the EPA stated that "[t]he exemption for substances used in routine agricultural operations applies only to substances stored or used by the agricultural user." *Id.*[4] This rule aligns with the exemption to relieve routine agricultural operations from reporting while allowing the community to plan for emergency releases of hazardous chemicals. Therefore, the Court gives considerable weight to the 1987 rule. However, routine agricultural operations might also be read to include the necessary incidents of farm animal maintenance and the 1987 rule did not reference animal waste and does not conclusively indicate whether hazardous emissions from animal waste would qualify for

---

[4] In *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F.Supp.2d 693, 713–14 (W.D. Kent. 2003), Tyson's Chicken argued that they were exempt from reporting emissions from their large chicken facilities because of the "routine agricultural operations" clause in EPCRA. The Western District of Kentucky referenced EPA's language in the 1987 Final Rule and concluded that the routine agricultural operations exemption did not apply to Tyson Foods' large feeding facilities. It stated, "Defendants do not store gaseous ammonia in their chicken houses for agricultural use [and] do not use this ammonia in an agricultural operation. Instead . . . the Defendants try to get rid of it because it is harmful to the chickens." *Id.*

1     the exemption.

2             **2.**      **2008 Final Rule**

3         The vacated 2008 final rule referenced reporting requirements from animal waste,

4 but the EPA explicitly did not define "routine agricultural operations" in the final rule.

5 73 Fed. Reg. 76948, 76951 (Dec. 18, 2008) ("The scope of this rule is intended to include

6 all hazardous substances that may be emitted to the air from animal waste at farms that

7 would otherwise be reportable under those sections. The Agency is not, in this rule,

8 defining facility, normal application of fertilizer, or routine agricultural operations.").

9             **3.**      **2018 Guidance Document**

10         Soon after the passage of the FARM Act, the EPA published an interpretation of

11 "routine agricultural operations." Envtl. Prot. Agency, "How do the reporting

12 requirements in EPCRA Section 304 apply to farms engaged in 'routine agricultural

13 operations'?" (Apr. 27, 2018), https://www.epa.gov/sites/production/files/2017-

14 10/documents/web_document_placeholder.pdf. The publication explains that "the

15 feeding and breeding of animals, as well as the expected handling and storage of the

16 animals' waste, would be considered a routine agricultural operation." *Id.*[5]

17         Not all executive decisions warrant *Chevron* deference. The "overwhelming

18 number" of Supreme Court cases applying *Chevron* deference "have reviewed the fruits

19 of notice-and-comment rulemaking or formal adjudication." *U.S. v. Mead Corp.*, 533

20 U.S. 218, 230 (2001). "Interpretations such as those in opinion letters—like

21 interpretations contained in policy statements, agency manuals, and enforcement

22 guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."

23 *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (citing *Reno v. Koray*, 515 U.S.

24 _____

25       [5] DWA argues that this 2018 guidance document should not apply retroactively to
Hickman's alleged misconduct. (Doc. 128 at 4–5). Courts also follow *Landgraf* analysis
26 to determine if a regulation should apply retroactively. *Sacks v. S.E.C.*, 648 F.3d 945,
950–52 (9th Cir. 2011). However, no *Landgraf* analysis is required if the regulation
27 "merely serves to clarify rather than change the substance of existing law." *Beaver v.
Tarsadia Hotels*, 816 F.3d 1170, 1186 (9th Cir. 2016). The EPA guidance document
28 clarifies the EPCRA exemption for routine agricultural operations and it does not change
the substance of the law. The Court therefore considers the EPA guidance in its decision.

50, 61 (1995) (internal agency guideline, which is not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," entitled only to "some deference" (internal quotation marks omitted))). When executive guidance does not warrant *Chevron* deference, as it appears not to in this case, courts should still give some weight to agency interpretations depending on the thoroughness of its consideration, validity of its reasoning, consistency with earlier and later pronouncements, and its general power to persuade. *Mead*, 533 U.S. at 234–35 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Thus at trial the Court invites the parties to address both the validity of the reasoning of the EPA's interpretation that routine agricultural operation would include the handling and storage of animal waste, and the meaning of that term under the statute. To the extent that EPCRA's statutory purpose is to respond to emergency emissions, the routine ammonia emissions from animal waste from existing facilities may not typically warrant an emergency response, or be the expected focus of state and local emergency planning commissions. But the Court will allow the parties to address this issue before ruling.

## II.    Motion for Clarification

DWA also filed a motion for clarification concerning the burden of proof for statutory exceptions and the order of trial. (Doc. 115). A party seeking the benefit of an exception bears the burden of proving that the exception applies. *E.E.O.C. v. Kamehameha Schools/Bishop Estate*, 990 F.3d 458, 460 (9th Cir. 1993); *U.S. v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994) (quoting *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) ("The well-established rule . . . that a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception.'")). An exception is an affirmative defense if the exception is "one that does not serve to negative any facts of the crime." *U.S. v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994) (internal quotations omitted). Therefore, where "a statutory prohibition is broad

and an exception is narrow, it is more probable that the exception is an affirmative defense." *Id.* In *U.S. v. Freter*, the Court considered whether the "federally permitted release" aspect of CERCLA was an affirmative defense. The applicable section stated, "[a]ny person . . . in charge of a facility from which hazardous substance is released, *other than a federally permitted release*, . . . who fails to notify immediately the appropriate agency . . . shall, upon conviction, be fined . . . or imprisoned . . ." 42 U.S.C. § 9603(b)(3) (emphasis added). The Ninth Circuit determined that the statutory exception was an affirmative defense because "releases qualifying as 'federally permitted' fall within both the broad definition of prohibited releases and the more narrow exception of permitted releases. Proof that a release is federally permitted therefore does not negate the government's evidence that a release did occur." *U.S. v. Freter*, 31 F.3d at 788.

Hickman's claims the benefit of two of EPCRA's statutory provisions. First, Hickman's claims the benefit of 42 U.S.C. § 11004(a)(4), which states, "Exempted releases: This section does not apply to any release which results in exposure to persons solely within the site or sites on which a facility is located." Although worded as an exempted release, it is not an exception that would qualify as an affirmative defense. The statute describes which releases require reporting under EPCRA, and which releases do not. Therefore, a "release which results in exposure to persons solely within the site" would not fall within the broader definition of a prohibited release under EPCRA, and proof that a release was maintained onsite would negate contrary evidence that a release occurred offsite.

Next, Hickman's claims the benefit of 42 U.S.C. § 11021(e)(5), which states "'hazardous chemical' has the meaning given such term by [federal regulations], except that such term does not include . . . [a]ny substance to the extent it is used in routine agricultural operations . . . ." This exception qualifies as an affirmative defense that Hickman's has the burden to prove. Ammonia emissions from animal waste could generally qualify under the broad prohibition against chemical releases and the narrow

exception for routine agricultural operations, and evidence that a release came from animal waste would not negate evidence that an otherwise prohibited release occurred. Therefore, Hickman's bears the burden to prove whether the "routine agricultural exception" applies. However, because DWA has the burden to prove that a qualifying release occurred, it will present first at trial.

## CONCLUSION

As described above, the Court concludes that the expected handling and storage of animal waste would be considered a routine agricultural operation under 42 U.S.C. § 11021(e)(5). Further, the Court grants Plaintiff's motion for clarification.

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Clarification (Doc. 115) is **GRANTED**. DWA has the burden to prove that a qualifying release occurred and it will present first at trial. Hickman's bears the burden of proving whether the "routine argument exception" applies.

Dated this 25th day of September, 2018.

G. Murray Snow
Chief United States District Judge