**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Don't Waste Arizona Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>Hickman's Egg Ranch Incorporated,<br><br>Defendant. | No. CV-16-03319-PHX-GMS<br><br>**REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

According to the stipulation of the parties, the Court held a bench trial regarding the Plaintiff's Complaint on October 17, 2018. Plaintiff filed a Motion for Reconsideration of the Court's Findings of Fact and Conclusions of Law (Doc. 143). The Court will grant the Motion in part and deny in part. The Court hereby makes its revised findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1.  Defendant Hickman's Egg Ranch, Inc. ("Hickman's") owns and operates Desert Pride Farms, which is located at 41625 West Indian School Road in Tonopah, Arizona ("Tonopah Facility").

2.  Hickman's also owns and operates a facility that is located at 32902 West Ward Road and 32425 West Salmone Highway in Arlington, Arizona ("Arlington Facility").

3.  Plaintiff Don't Waste Arizona ("DWA") is a non-profit organization dedicated to protecting the Arizona environment. Certain members of DWA live in the

vicinity of the two facilities owned by Hickman's.

4. A natural byproduct of the decomposition of chicken waste is ammonia, which is included among the chemical compounds that are listed as extremely hazardous substances under the Emergency Planning and Community Right to Know Act ("EPCRA") 42 U.S.C. §§ 11001–11050; *see also* 40 C.F.R. § 302.4.

5. The purpose of EPCRA is "to encourage and support emergency planning efforts at the State and local levels and to provide the public and local governments with information concerning potential chemical hazards present in their communities." 52 ed. Reg. at 13378 (Apr. 22, 1987).

6. Although the figures vary from month to month, documents produced by Hickman's show that the Arlington Facility housed as many as 4,127,267 laying hens in May 2013 while the Tonopah Facility housed as many as 3,344,877 laying hens in January 2017.

7. Both the Tonopah and Arlington Facilities emitted into the air over 100 pounds per day of ammonia from animal waste during the timeframes relevant to this proceeding.

8. Individuals from both Arlington and Tonopah testified that they could smell ammonia regularly at their residences following the construction of both the Arlington and Tonopah Facilities.

9. Where releases of hazardous substances are continuous, the EPCRA reporting requirement is satisfied if an initial notice is provided to the National Response Center ("NRC"), the State Emergency Response Commission ("SERC"), and the Local Emergency Planning Committee ("LERC") in the state in which the release occurs. 40 C.F.R. § 302.9. Prior to the passage of the FARM Act, EPA determined that release of hazardous substances from animal waste typically qualify for continuous release reporting. *See* Final Rule, (Dec. 18, 2008), 73 Fed. Reg. 76,948 at 76,952.

10. In 2006, Hickman's submitted a letter to the Environmental Protection Agency ("EPA") Office of Regulatory Enforcement. There, Hickman's acknowledged the

Arlington Facility "may generate routine air emissions of ammonia in excess of the reportable quantity of 100 pounds per 24 hours," and that "a rough estimate of those emissions is approximately 125 pounds per 24 hours, but this estimate could be substantially above or below the actual emission rate." (Defendant's Trial Ex. 101). At the time, EPA was developing an emission rate factor to estimate the amount of ammonia generated by large agricultural operations. The letter further explained that because an emission rate factor was under development, when EPA finalized that emission rate, Hickman's would "notify [EPA] of any reportable release pursuant to CERCLA section 103 or EPCRA section 304." (*Id.*). EPA did not ultimately produce an emission rate factor for ammonia from chicken waste.

11. On May 2, 2016, Plaintiff served written notice on Hickman's of its intent to file a citizen's action under provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 and EPCRA, based on Hickman's alleged failure to submit notification under these statutes that reportable quantities of hydrogen sulfide and ammonia had been released at the Arlington and Tonopah Facilities.

12. Nearly five months later, Plaintiff filed its Complaint. (Doc. 4). The Complaint alleged that Hickman's violated EPCRA because it failed to file the necessary reports regarding the release of ammonia at the Arlington Facility and the Tonopah Facility. Hickman's filed an answer denying liability on October 21, 2016. (Doc. 11).

13. There are additional agricultural operations within two to five miles of the Arlington and Tonopah facilities, including multiple dairy farms that produce cow waste. (Defendant's Trial Ex. 106). Ammonia is also a natural byproduct of cow waste.

14. Once the chicken waste is dried at its facilities, Hickman's processes the chicken waste and sells it as a fertilizer to facilities in neighboring areas.

15. In March 2017, Hickman's filed compliance reports with the NRC, SERC and LERC. (Doc. 107 at 6). Hickman's also filed an update to these reports in March 2018. (*Id.*).

///

16. After the construction of the Arlington and Tonopah facilities, individuals living near the facilities filed complaints with the Arizona Department of Environmental Quality ("ADEQ") and other environmental agencies. ADEQ has never found that Hickman's was in violation of state or federal environmental laws.

17. Earlier this year, Congress enacted the Consolidated Appropriations Act of 2018. The act incorporated at Division S, Title XI the Fair Agricultural Reporting Method Act ("FARM Act"), which amended Section 103 of CERLA to eliminate any reporting requirement for air emissions from animal waste or the decomposition of animal waste. EPCRA's reporting requirements under section 304 extend to releases that "require[] a notification under section 103(a) of [CERCLA]." 42 § U.S.C. 11004.

18. EPA recently issued a Guidance Document detailing when EPCRA applies to farms engaged in "routine agricultural operations." EPA Office of Land and Emergency Management, *How Do the Reporting Requirements in EPCRA Section 304 Apply to Farms Engaged in "Routine Agricultural Operations"?* (Apr. 27, 2018), https://www.epa.gov/sites/production/files/2017-10/documents/web_document_placeholder.pdf ("EPA Guidance 2018").

19. On September 25, 2018 this Court issued an order clarifying various legal issues before the trial without a jury. (Doc. 130) ("Clarifying Order"). Among other issues, the Clarifying Order found that the FARM Act was not retroactively applicable, that Plaintiff has the burden to prove that the release resulted in exposure to persons outside the facility, and that Defendant has the burden to prove that the release falls within the exemption at 42 U.S.C. § 11021(e)(5). (Clarifying Order at 10–11).

### CONCLUSIONS OF LAW

Defendant has conceded that Plaintiff has standing to prosecute this action under EPCRA. So the Court will only analyze the merits issues. Due to the passage of the FARM Act, however, this Order only considers whether Hickman's violated EPCRA by not

making a required continuous release report concerning ammonia release prior to March 28, 2017.

### 1. Prior to the passage of the Farm Act, ammonia generated as a byproduct of chicken waste was an "extremely hazardous material" released into the environment that triggered reporting requirements under EPCRA.

EPCRA directs the EPA Administrator to list hazardous substances along with the amount of substance that must be released to trigger EPCRA reporting requirements. *See* 42 U.S.C. § 11002(a)(2) (directing the Administrator to publish a list of extremely hazardous substances within 30 days). The list of extremely hazardous substances can be found at 40 C.F.R. § 302.4. Under EPCRA section 11004(a), merely possessing a hazardous substance is not enough to trigger reporting requirements. Specifically, EPCRA requires a notification only "if a release of an extremely hazardous substance . . . occurs from a facility." 42 U.S.C. § 11004(a)(1)–(2).

Ammonia is an extremely hazardous substance listed under 40 C.F.R. § 302.4. Chicken waste is not listed under 40 C.F.R. § 302.4, nor is it "released" into the environment.

### 2. The release of ammonia at both the Arlington and Tonopah Facilities does not fall within the statutory exemption at 42 U.S.C. § 11004(a)(4).

Under EPCRA, a release is not reportable if it "results in exposure to persons solely within the site or sites on which a facility is located." 42 U.S.C. § 11004(a)(4). As discussed in the Clarifying Order, the burden to establish that the ammonia releases resulted in exposures to persons outside the facility falls on DWA, who must establish that persons were exposed to the ammonia by the preponderance of the evidence. Unlike the release provision, which requires 100 pounds of ammonia to be released to trigger the reporting requirement *see* 40 C.F.R. § 302.4, the implementing regulations do not require a specific amount of exposure to persons to avoid liability under 11004(a)(4). Thus, *some* level of exposure to ammonia outside the site is sufficient to trigger the reporting requirement.

The Court has determined that more than 100 pounds of ammonia was released into the ambient air daily. Several individuals from both Arlington and Tonopah also testified that they could smell ammonia regularly at their residences following the construction of both the Arlington and Tonopah Facilities.

That Hickman's later measured zero ammonia parts per million at the facility borders once a month does not demonstrate that no persons were ever exposed to ammonia from the facilities during the relevant time frame. Plaintiff's dispute whether the device used by Hickman's to measure ammonia at the facility is even designed to make measurements of ammonia in the ambient air. (Plaintiff's Trial Ex. 33). Hickman's admits that it employs no machinery to capture, store, or otherwise prevent the gaseous ammonia from entering the ambient air. And while there are other agricultural operations in the vicinity of Hickman's, it is not plausible that releasing large quantities of ammonia into the ambient air daily for a period of years did not regularly result in exposure to persons outside the facility. Accordingly, the release at issue here does not fall within the exemption in 42 U.S.C. § 11004(a)(4).

### 3. Ammonia released as a byproduct of chicken waste is not a hazardous material "used in a routine agricultural operation."

In April 2018, EPA issued a guidance document that describes the activities that fall within the routine agricultural operation exemption under 42 U.S.C. § 11021(e)(5). In that guidance document, EPA reasoned that "the feeding and breeding of animals, as well as the expected handling and storage of the animals' waste, would also be considered a routine agricultural operation," and interpreted 42 U.S.C. §11021(e)(5) to include "handling and storage of waste for potential use as a fertilizer." *See* EPA Guidance 2018.

As discussed in this Court's Clarifying Order, "policy statements, agency manuals and enforcement guidelines . . . do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). When executive guidance does not warrant *Chevron* deference, courts should still give some weight to agency interpretations depending on the thoroughness of its consideration, validity of its reasoning, consistency

with earlier and later pronouncements, and its general power to persuade. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

EPCRA generally requires reporting of all releases of hazardous materials that were "produced, used, or stored" at a facility. 42 U.S.C. § 11004(a)(1). In a separate subsection, EPCRA clarifies that the term "hazardous materials" does not cover "any substance to the extent it is *used in* routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate customer." 42 U.S.C. § 11021(e)(5) (emphasis added). The statutory provision by its terms does not exempt *all* activities at routine agricultural operations from reporting requirements under EPCRA. It specifically limits the exemption to hazardous materials "*used in* routine agricultural operations." 42 U.S.C. § 11021(e)(5) (emphasis added). Had Congress wanted to exempt all substances at routine agricultural operations from reporting requirements, it could have simply stated that routine agricultural operations are entirely exempt.

"[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (internal citation and quotation marks omitted); *see also Bailey v. United States*, 516 U.S. 137, 146 (1995) (distinction in one provision between "used" and "intended to be used" creates implication that related provision's reliance on "use" alone refers to actual and not intended use). Because Congress deployed the phrase "produced, used or stored" when defining what releases are reportable, but only deployed the word "used" when defining this exemption, Congress likely did not intend to exclude releases from materials that are produced or stored at, but not ultimately used in routine agricultural operations, with the exception of a fertilizer held for sale to the ultimate consumer.

"Used" is defined as "employed in accomplishing something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2524 (1961). Hickman's does not employ the ammonia in accomplishing any ultimate goal or objective. The gaseous ammonia is instead

a mere byproduct of the agricultural operation. Thus, the ammonia does not qualify as a material "used in" a routine agricultural operation.

### 4. Ammonia released as a byproduct of chicken waste is not "a fertilizer held for sale to the ultimate consumer."

The statutory language exempts hazardous materials from the EPCRA reporting requirements if that material "is a fertilizer held for sale to the ultimate consumer." 42 U.S.C. § 110021(e)(5). It is possible that the EPA Administrator could list common fertilizers under the EPCRA reporting requirements, and Congress was probably aware of that possibility when it was drafting 110021(e)(5). And those fertilizers, if held for sale by a facility, and subsequently released into the environment, would fit within the exemption. But the gaseous ammonia released by the chicken waste itself is not a fertilizer held by Hickman's.[1] Instead, the ammonia is a *byproduct* of a material—the chicken waste—that is eventually converted to a fertilizer. That Hickman's later processed the chicken waste and sold it as a fertilizer does not transform the gas released by the chicken waste at an earlier stage into a fertilizer. So even assuming this Court would find that the chicken waste was a fertilizer, a gaseous byproduct released by its decomposition would not qualify for the exemption under 42 U.S.C. § 110021(e)(5).

### 5. The Court will impose a penalty below the maximum amount for an emissions reporting violation for each of the Hickman's Facilities.

The Court finds that Hickman's failed to comply with the written notice requirement under EPCRA for 592 days for the Tonopah Facility, and for 1,825 days for the Arlington Facility. Hickman's violations here essentially amount to two failures to report a continuous emissions release. *See* Final Rule, (Dec. 18, 2008), 73 Fed. Reg. 76,948 at 76,952. If considered a continuous emissions release, the maximum penalties under EPCRA for each release are $25,000 dollars.

EPA published an Enforcement Response Policy for its own enforcement actions

---

[1] A fertilizer is defined as "a substance (as manure, lime or commercial fertilizer) used to fertilize soil; *esp* one chemically prepared that supplies nutrients." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 840 (1961).

that may also be used as a guideline here. *See* EPA Office of Regulatory Enforcement and Compliance Assurance, *Enforcement Response Policy For Sections 304, 311 and 312 of the Emergency Planning and Community Right-to-Know Act*, (Sept. 30, 1999), https://www.epa.gov/sites/production/files/documents/epcra304.pdf ("ERP"). While the Court is not required to apply the ERP guidelines, both parties agree that the Court should look to the ERP to help determine what penalty to impose on Hickman's.

The ERP lays out four factors to weigh in determining whether or not to impose the maximum daily penalty: the nature of the violation, the extent of the violation, the gravity of the violation, and the circumstances of the violation. ERP at 9-17. EPA also lists adjustment factors for penalties, including the ability to pay and continue in business, the prior history of violations, the degree of culpability, the economic benefit of non-compliance, and other matters as justice may require. ERP at 22-28. Penalties imposed by EPA under this rubric in the past for violations range from $7,735 to $278,000. (Doc. 107, Ex. A).

When determining the circumstances surrounding a violation, EPA looks at any actual problems that first responders and emergency managers encountered due to a failure to notify, the effect noncompliance has on the LEPC's ability to plan for chemical emergencies, and the potential for emergency personnel, the community and the environment to be exposed to hazards posed by noncompliance.

None of these factors point towards imposing a harsh penalty. There were no actual problems that emergency personnel encountered due to Hickman's lack of reporting, and Hickman's failure to report did not impact the LEPC's ability to plan for chemical emergencies. And while Hickman's failure to report the ammonia emissions likely deprived the community of some information regarding hazardous substances in their community, many members of the public were aware of the facilities and the ammonia they emit, and there is no established method for calculating the specific amount of ammonia emissions from chicken waste. Finally, the noncompliance *itself* did not greatly increase

the likelihood of the public to be exposed to hazardous materials.[2] After all, these releases are not illegal under any other statute.

Other adjustment factors point in favor of a modest fine. Hickman's does not have a history of prior violations under EPCRA or other environmental statutes. There is no evidence that Hickman's gained any meaningful economic advantage over other agricultural operations by not reporting the ammonia emissions under EPCRA. ERP at 28. And a severe penalty issued here could threaten Hickman's ability to stay in business.

The ERP also allows for consideration of "other matters as justice may require." ERP at 31. The law surrounding reporting requirements for animal waste under EPCRA has been in flux since EPCRA was passed in 1986. *See* 1987 Final Rule; 2008 Final Rule, 73 Fed. Reg. 76,948 (Dec. 18, 2008), *vacated by Waterkeeper Alliance v. EPA*, 853 F.3d 527 (D.C. Cir. 2017); EPA Guidance 2018.[3] To date, EPA has still failed to develop an emission rate factor for estimating the amount of ammonia emissions from chicken waste at agricultural operations like Hickman's. Unlike many other instances where EPA has implemented harsh penalties on large agricultural operations, Hickman's has not been found to violate any other environmental statutes in this proceeding, such as the Clean Water Act or CERCLA. (Doc. 107, Ex. A). And Hickman's has recently come into compliance with EPCRA and filed a continuous emissions release report for both the Arlington and Tonopah Facilities. (Defendant's Tr. Ex. 6, 7; *see also* Doc. 139). After the passage of the FARM Act, no agricultural operation will be penalized for failing to report

---

[2] In the 2008 Final Rule on this subject, EPA stated that reports regarding emissions from animal waste "are unnecessary because, in most cases, a federal response is impractical and unlikely." 73 Fed. Reg. at 76,956.

[3] Congress recently exempted these types of releases from reporting under CERCLA when it passed the FARM Act. EPA recently proposed new regulations exempting animal waste emissions from reporting requirements under EPCRA—a necessary consequence of the amendments to CERCLA. *See* EPA, Proposed Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, (Oct. 30, 2018), https://www.epa.gov/sites/production/files/2018-10/documents/proposed_epcra_amendment_signed_10-30-18.pdf. The proposed regulation incorporates the FARM Act's exemption of animal waste to EPA's existing regulations under EPCRA.

emissions generated from animal waste, because they are no longer subject to the reporting requirements of EPCRA.

At trial, Plaintiff's counsel pointed to three pieces of evidence to suggest that a large fine should be imposed on Hickman's. First, Plaintiff argued that the letter submitted to EPA in 2006 should be considered evidence that Hickman's was aware that the Arlington Facility needed to submit reports under EPCRA. Second, Plaintiff pointed to the numerous complaints filed by individuals living in the Arlington and Tonopah areas. Finally, Plaintiff points to the fact that Hickman's failed to take any action to come into compliance with EPCRA after it received Plaintiff's 60-day notice letter.

The first two pieces of evidence seem to cut against assessing a harsh penalty against Hickman's. The letter indicates that the regulating agency was aware of Hickman's emissions at the Arlington facility and chose not to request further action. And the fact that ADEQ, after receiving all of these complaints, did not require Hickman's to take further action, supports the conclusion that Hickman's was not acting in bad faith here. Hickman's regularly coordinates with state regulators, and there is no evidence that Hickman's is in violation of *any* other state or federal environmental laws. But Hickman's did fail to take any action after Plaintiffs filed their 60-day Notice, and even after the Complaint in this case was filed.

Because Hickman's failed to comply with EPCRA, the Court will assess a fine of 1,500 dollars for each facility, totaling 3,000 dollars. This amount is below other EPA enforcement actions where there were violations of other environmental laws, and will not be so harsh as to put Hickman's out of business.

Any conclusion of law deemed a finding of fact is so adopted.

## CONCLUSION

For the reasons stated above, the Court will grant the Motion for Reconsideration and enters judgment in Plaintiff's favor in the amount of three thousand dollars ($3,000.00). Plaintiff is directed to file a Notice and lodge a proposed final judgment on or before December 27, 2018.

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Reconsideration is granted in part and denied in part (Doc. 143).

**IT IS FURTHER ORDERED** directing Plaintiff file a Notice and lodge a proposed final judgment order on or before **December 27, 2018**.

Dated this 19th day of December, 2018.

G. Murray Snow
Chief United States District Judge